# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: May 31, 2019

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
DONATA TINA BUSSA,                      *
executor of the estate of               *          UNPUBLISHED
ANDREW BUSSA, deceased,                 *
                                        *          No. 15-202V
                   Petitioner,          *
v.                                      *          Special Master Gowen
                                        *
SECRETARY OF HEALTH                     *          Attorneys' Fees and Costs;
AND HUMAN SERVICES,                     *          Respondent's Objection to
                                        *          Reasonable Basis; Disputed
                   Respondent.          *          Diagnosis; Severity Requirement.
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

Ronald C. Homer, Conway, Homer, P.C., Boston, MA, for petitioner.
Adriana R. Teitel, United States Department of Justice, Washington, DC for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

     Now ripe for adjudication is an application for attorneys' fees and costs filed by Donata Tina Bussa ("petitioner"), as executor of the estate of Andrew Bussa, deceased, following dismissal of her petition in the National Vaccine Injury Compensation Program.[2]  Pet. App. (ECF No. 73).  As detailed below, I find that the petition was filed in good faith and with a reasonable basis.  Those were maintained up until petitioner filed for voluntary dismissal rather than proceeding to an entitlement hearing in recognition of the difficulty of establishing both the injury alleged and residual injuries lasting for more than six months.  Accordingly, she is awarded $80,132.17 in reasonable attorneys' fees and costs and is reimbursed for $111.00 in costs she personally incurred.

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), **because this opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.**  The Court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7.  Before the opinion is posted on the Court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes  medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of  privacy."  Vaccine Rule 18(b).  An objecting party must provide the Court with a proposed redacted version of the opinion.  *Id.*  **If neither party files a motion for redaction within 14 days, the opinion will be posted on the Court's website without any changes.**  *Id.*

[2] The Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. §§ 300aa-10 *et seq.* (hereinafter "Vaccine Act" or "the Act").  Hereafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.    Procedural History

On March 2, 2015, Mr. Andrew Bussa, through the attorney of record, filed a petition in the Vaccine Program.  He alleged that as a result of receiving an influenza ("flu") vaccination on October 24, 2013, he suffered a "neurological demyelinating injury, Guillain-Barré syndrome ('GBS')."  Petition (ECF No. 1) at Preamble.  The matter was assigned to Special Master Laura Millman.  Notice of Assignment on March 3, 2015 (ECF No. 4).  Over the next few months, Mr. Bussa filed medical records in support of his claim and two affidavits.  Petitioner's Exhibits ("Pet. Exs.") 1-21 (ECF Nos. 9-11, 15, 17, 20).  On August 20, 2015, he filed an amended petition providing more detail.  Amended Petition (ECF No. 21).  This amended petition acknowledged his prior history of congestive heart failure, coronary artery disease, hypothyroidism, and a cardiac stent.  *Id.* at ¶ 1, n. 4.  It also acknowledged that the post-vaccination medical records referenced congestive heart failure, possible transient ischemic attack ("TIA"), and other alternative explanations for the alleged vaccine injury.  *Id.* at ¶¶ 4-23.

Special Master Millman's preliminary view, introduced during a status conference on August 25, 2015, was that the medical records did not establish the alleged injury of GBS or more than six months of sequelae.  Order filed on August 26, 2015 (ECF No. 22).  She also noted that Mr. Bussa was diagnosed with a TIA and essential thrombocytosis.  Order filed November 24, 2015 (ECF No. 31).  Petitioner conveyed a demand to respondent.  *Id.*  However, respondent declined to discuss settlement.  Order filed December 8, 2015 (ECF No. 32).  Respondent filed a report pursuant to Vaccine Rule 4(c) recommending against compensation for the grounds identified by the special master.  Respondent's Report ("Resp. Rep't.") (ECF No. 34).  After another status conference, on March 24, 2016, petitioner filed Dr. Nizar Souayah's initial report in support of the claim.  Pet. Ex. 33 (ECF No. 37).

On April 8, 2016, Special Master Millman directed petitioner's counsel to ask Dr. Souayah to write a supplemental report about when Mr. Bussa's GBS ended and why Dr. Souayah attributed Mr. Bussa's chronic fatigue to GBS and not his numerous other comorbidities.  *See* Order filed April 8, 2016 (ECF No. 38).  Petitioner's counsel also communicated that Mr. Andrew Bussa had passed away.  His death on February 1, 2016 was natural and attributed to ischemic cardiomyopathy, acute and chronic systolic congestive heart failure, and chronic kidney disease stage 3.  *Id.*; Pet. Ex. 35 (ECF No. 39).  Petitioner's counsel indicated that she was working to obtain the proper documents establishing that Mr. Bussa's wife had representative authority over his estate.  Order (ECF No. 38).

On May 23, 2016, petitioner's counsel filed Dr. Souayah's second report.  Pet. Ex. 43.  During a status conference on June 6, 2016, petitioner's counsel stated that Mr. Bussa's wife did not want to incur the expense of getting representative authority over his estate "until she hears [the special master's] view of the case."  Order filed June 6, 2016 (ECF No. 44).  Special Master Millman explained that the two issues were whether Mr. Bussa had GBS and if so, whether Mr. Bussa experienced more than six months of sequelae.  Special Master Millman did "not think that petitioner ha[d] adequately proven that Mr. Bussa experienced more than six months of sequelae" because neurologic exams in December 2013 and January 2014 were normal, and petitioner had complained about fatigue before receiving the vaccine.  *Id.*

On August 22, 2016, petitioner's counsel filed notice of Ms. Donata Tina Bussa's appointment as executor of the estate of Mr. Andrew Bussa, deceased (ECF No. 48), as well as a motion to amend the case caption, which was granted (ECF Nos. 49-50).

Pursuant to Special Master Millman's orders, on December 29, 2016, respondent filed Dr. Peter Donofrio's initial report in opposition to petitioner's claim.  Resp. Ex. A (ECF No. 53). Special Master Millman directed petitioner to file a responsive expert report from Dr. Souayah. Order filed January 12, 2017 (ECF No. 55).  On April 12, 2017, petitioner filed Dr. Souayah's third report.  Pet. Ex. 45 (ECF No. 57).

On April 13, 2017, Special Master Millman issued an order summarizing the proceedings to date.  She provided: "GBS did not cause Mr. Bussa's death.  Petitioner's only hope of recovering compensation for Mr. Bussa's estate is to pursue the theory that as a consequence of GBS, Mr. Bussa had more than six months of chronic fatigue."  However, during Mr. Bussa's hospitalization for the alleged injury approximately one week after the vaccination, he was found to have significant heart disease, which could cause severe fatigue on its own.  Special Master Millman provided that no further expert opinions would be helpful.  She would ask her law clerk to give possible hearing dates to counsel.  However, that did not reflect that she had "made any determination that there was a reasonable basis to go forward in this case."  She suggested that counsel discuss the "weakness" and "considerable problems" in the case before going forward. Order filed April 13, 2017 (ECF No. 59).  After counsel provided their availability to Special Master Millman's law clerk, on June 2, 2017, she set the case for an entitlement hearing on June 28, 2018.  Order (ECF No. 60).

There were no additional filings on the case docket until January 16, 2018, when the case was reassigned to me.  Notice of Reassignment (ECF No. 62).  On February 22, 2018, I held an initial status conference with counsel during which I communicated that it would be difficult for petitioner to establish that Mr. Bussa developed GBS and residual injuries lasting for more than six months.  Order (ECF No. 63).  I encouraged petitioner to voluntarily dismiss the claim or request a ruling on the record, rather than proceed to the entitlement hearing previously set for June 2018.  *Id.*  Petitioner's counsel discussed the options with petitioner, then requested and received an extension of time to decide how to proceed, Pet. Motion filed March 22, 2018 (ECF No. 64), which was granted, Order filed March 22, 2018 (Non-PDF).  Petitioner's counsel then indicated that counsel of record would not proceed to the entitlement hearing and requested additional time for petitioner to seek alternate counsel.  Pet. Motion filed April 5, 2018 (ECF No. 65).  On April 6, 2018, I cautioned that "reasonable basis may be a problem going forward" in light of the issues memorialized in the order issued on February 22, 2018 but granted petitioner additional time.  Petitioner was ordered to inform the Court how she wished to proceed by May 22, 2018.  Order filed April 6, 2018 (ECF No. 66).  On April 24, 2018 and on April 26, 2018, petitioner left voicemails for my law clerk requesting additional time and to speak with me directly (although she was technically still represented by the counsel who intended to withdraw from the claim).  On May 16, 2018, I held a status conference with petitioner accompanied by her adult daughter, her counsel of record, and respondent's counsel.  I suggested that petitioner's counsel of record had adequately represented the claim up to that point, that there were significant obstacles to compensation, and that petitioner should consider voluntary dismissal rather than proceeding with alternate counsel or *pro se*.  The pre-hearing deadlines were

suspended and petitioner was directed to inform the Court how she wished to proceed by June 6, 2018. Order filed May 17, 2018 (ECF No. 67). On June 6, 2018, petitioner filed a motion for a decision dismissing the petition (ECF No. 68), which was granted on the same day (ECF No.69). Judgment was entered on July 10, 2018 (ECF No. 71) and petitioner filed her election to file a civil action on July 12, 2018 (ECF No. 72).

On November 7, 2018, petitioner filed a motion for attorneys' fees and costs. Pet. Fee App (ECF No. 73). She requested $75,191.00 in attorneys' fees, $29,396.70 in attorneys' costs, and $111.00 in costs which she personally incurred for a total request of $104,698.70. *Id.* On November 19, 2018, respondent filed a response contending that petitioner had not established a reasonable basis for filing or pursuing the claim, thus, the request for any attorneys' fees and costs must be denied. Resp. Response (ECF No. 74). On December 26, 2018, petitioner filed a reply arguing that there was reasonable basis for the claim. Pet. Reply (ECF No. 77).

On January 4, 2019, petitioner filed a supplemental application for an additional $12,162.20 in attorneys' fees billed for preparing her reply regarding reasonable basis for the claim. Pet. Supp. Fee App. (ECF No. 78). On February 1, 2019, respondent filed a response opposing those fees as well. Resp. Response to Supp. Fee App. (ECF No. 80). On February 8, 2019, petitioner filed a brief reply incorporating her earlier arguments. Pet. Reply to Supp. Fee App. (ECF No. 81). This matter is now ripe for adjudication.

## II.   Entitlement to Attorneys' Fees and Costs

### A.  Legal Standard

The Vaccine Act provides that reasonable attorney's fees and costs "shall be awarded" for a petition that results in compensation. §15(e)(1)(A)-(B). Even when compensation is not awarded, reasonable attorneys' fees and costs "may" be awarded "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for which the claim was brought." § 15(e)(1). The Federal Circuit has reasoned that in formulating this standard, Congress intended "to ensure that vaccine injury claimants have readily available a competent bar to prosecute their claims." *Cloer v. Sec'y of Health & Human Servs.*, 675 F.3d 1358, 1362 (Fed. Cir. 2012).

"Good faith" and "reasonable basis" are two distinct requirements. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (citing *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 289 (2014)). "Good faith" is a subjective standard. *Id.*

In contrast to good faith, "reasonable basis" is an objective consideration of the totality of the circumstances except for the statute of limitations or any directly related conduct by petitioner's counsel. *Simmons*, 875 F.3d at 635; *Chuisano*, 116 Fed. Cl. at 289. However, this evaluation may include various objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289-90 (2018). "[I]n deciding reasonable basis the Special Master needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery."

*Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018).  A petitioner must furnish some evidence in support of the claim.  *Bekiaris v. Sec'y of Health & Human Servs.*, 140 Fed. Cl. 108, 115 (2018) (reasoning that the petitioner must "adduce medical evidence going to causation beyond temporal proximity").  For example, in *Chuisano*, the Court of Federal Claims held that a petitioner's statement plus temporal proximity was insufficient.  The court suggested that additional sources of support would include medical records mentioning the vaccination; treating physicians' attribution of the injury to the vaccination; and expert opinion.  *Chuisano*, 116 Fed. Cl. at 290.

Reasonable basis may exist at the time a claim is filed but dissipate as the case progresses.  *R.K. v. Sec'y of Health & Human Servs.*, 760 Fed. Appx. 1010, 1012 (Fed. Cir. March 15, 2019) (citing *Perreira v. Sec'y of Health & Human Servs.*, 33 F.3d 1375, 1376-77 (Fed. Cir. 1994) for the holding that "an award of fees and costs was not authorized for work performed on a case after a claim lost its reasonable basis").  "Petitioners' counsel have an obligation to voluntarily dismiss a Vaccine Act claim once counsel knows or should know a claim cannot be proven."  *Cottingham v. Sec'y of Health & Human Servs.*, 134 Fed. Cl. 567, 574 (2017) (citing *Perreira*, 33 F.3d at 1376; *Curran v. Sec'y of Health & Human Servs.*, 130 Fed. Cl. 1, 6 (2017); *Allicock v. Sec'y of Health & Human Servs.*, 128 Fed. Cl. 724, 727 (2016)).

Respondent not infrequently contends that petitions filed in the Vaccine Program that do not result in compensation lack reasonable basis for even filing in the first place.  However, reasonable basis is clearly a separate standard for petitions *not* resulting in compensation.  Some petitions are dismissed after lengthy litigative proceedings including a hearing and a written opinion by the Court.

Other petitions are dismissed at earlier stages.  Dismissal can be involuntary by the Court for reasons such as failure to prosecute or insufficient proof.  Vaccine Rule 21(b).  Alternatively, under Vaccine Rule 21(a), a petitioner can voluntarily dismiss his or her own claim.[3]

In my experience, the viability of a claim can change after it is filed based on factors such as updated medical records and petitioner's degree of success in obtaining support from fact and/ or expert witnesses.  Counsel practicing within the Vaccine Program are often effective in explaining these issues to the petitioners they represent.  However, I sometimes find it productive to have a status conference to discuss these issues directly with a petitioner himself or herself (as well as both parties' counsel).  When a petitioner and his or her counsel voluntarily dismiss a claim, they might not fully develop issues as far as if the claim had been fully litigated.  However, in nearly all instances in which I recommend that petitioners to voluntarily dismiss their claims, I have reached a preliminary conclusion that further litigation would not be productive.  Under these circumstances, voluntary dismissal reduces the time, effort, and expense demanded from the Court and respondent.  In my view, a petitioner's voluntary dismissal of a claim at a reasonable juncture is among the totality of circumstances that should be considered in evaluating whether the claim retained reasonable basis throughout its pendency.

---

[3] *See also* Court of Federal Claims, *Sample Filings – Notice to Withdraw Petition*; *Joint Stipulation of Dismissal*; *Motion for Dismissal Decision*; available at http://www.uscfc.uscourts.gov/vaccine-sample-filings (last accessed on April 29, 2019).

### B. Application

Upon review, I find that this petition possessed reasonable basis when it was filed and up until its voluntary dismissal. The petition alleged that Mr. Andrew Bussa received an influenza ("flu") vaccine on October 24, 2013 and that as a result, he developed Guillain-Barré syndrome ("GBS") with residual injuries lasting over six months. Petition (ECF No. 1); Amended Petition (ECF No. 21).

GBS is recognized as an autoimmune condition. The Vaccine Program frequently awards compensation to petitioners that develop GBS following vaccinations, particularly those for influenza. *See* Pet. Reply at 16, n. 15. Indeed, GBS with onset within 3-42 days following flu vaccination is now listed on the Vaccine Injury Table. 82 Fed. Reg. 6294, 2017 WL 202456 (Jan. 19, 2017), codified at 42 C.F.R. § 100.3 (effective March 21, 2017). In this case, Mr. Bussa did receive a flu vaccine on October 24, 2013. Ex. 6 at 87; Pet. Ex. 22.

However, the first obstacle to this claim was whether Ms. Bussa subsequently developed GBS as claimed in the petition. Approximately six days after his flu vaccination, on October 30, 2013, Mr. Bussa experienced the sudden onset of symptoms including generalized weakness in his lower extremities with absent or reduced deep tendon reflexes. Pet. Ex. 5. He was hospitalized at Glen Cove Hospital, then referred to St. Francis Hospital at the family's request. Pet. Ex. 1 at 23. On November 1, 2013, a neurologist named Dr. Stevens recorded a history of generalized weakness and observed some sensory symptoms including "mildly decreased vibration bilateral lower extremities" although "pinprick appears to be intact." Pet. Ex. 14 at 452. Dr. Stevens believed this was an infectious process following the flu vaccine and "there is some concern about the possibility of… Guillain-Barré." He ordered a lumbar puncture. *Id.* at 453. On November 2, 2013, Dr. Stevens repeated the suspicion of GBS. *Id.* at 404-07. On November 3, 2013, Dr. Stevens recorded that the lumbar puncture was negative for albumin-cytologic disassociation but that can take two weeks to appear. Dr. Stevens maintained his belief that Mr. Bussa had GBS, but it appeared to be resolving and treatment was not indicated at that time. *Id.* at 434-37. On November 4, 2013, Mr. Bussa was discharged. While GBS was not listed on the discharge summary, Mr. Bussa was directed to follow up with the neurologist Dr. Stevens as well as a cardiologist. *Id.* at 467-69. On November 15, 2013, Dr. Stevens repeated his diagnosis of GBS and discouraged future flu shots. Pet. Ex. 15 at 11-12. On May 23, 2014, Dr. Stevens recorded Mr. Bussa's complaint of feeling "weak all over" and history of "persistent weakness x months… concern for possible ??GBS following flu shot 2013 has weight loss has complaint of right leg heaviness as well." *Id.* at 13. Neurological examination showed "normal [coordination,] [decreased] [pin prick,] and [vibration] [bilateral lower extremities] … all reflexes [symmetrically] diminished." *Id.* Dr. Stevens did not rule out his suspicion of GBS. His plan was: "? Residual neuropathy [versus] [radiculopathy]." *Id.* at 14. He recommended that Mr. Bussa pursue EMG/NCS testing with Dr. Simpson, a neurologist with particular

expertise with peripheral neuropathy at Mount Sinai Hospital.  *Id.*[4]  However, as of June 16, 2015, this physician's office had no records pertaining to Mr. Bussa.  Pet. Ex. 24.[5]

After the presiding special master questioned the alleged injury of GBS, petitioner retained Dr. Nizar Souayah who has experience treating and researching GBS as well as opining in the Vaccine Program.  Pet. Ex. 33 at 1; *see also* Pet. Ex. 34 (curriculum vitae).  Dr. Souayah opined that Mr. Bussa had developed GBS.  Pet. Ex. 33 at 5.  He opined that Mr. Bussa developed progressive motor weakness of more than one limb, areflexia, and other findings consistent with the diagnostic criteria for GBS.  Pet. Ex. 33 at 5.[6]

Respondent then retained another neurologist with similar qualifications, Dr. Donofrio, who contended that most of the treating physicians, including the first neurologist Dr. Robinson at Glen Cove Hospital, did not evaluate or treat Mr. Bussa for GBS.  Additionally, Mr. Bussa's presentation was inconsistent with Dr. Donofrio's clinical experience.  Dr. Donofrio cited Asbury and Cornblath for the proposition that GBS "does not improve within 1-2 days as was observed" with Mr. Bussa.  Resp. Ex. A.  Dr. Donofrio did not address whether Asbury and Cornblath's criteria are appropriate for diagnosing GBS or whether those criteria were met in Mr. Bussa's case.  Instead, Dr. Donofrio opined that Mr. Bussa did not meet any level of the Brighton criteria for GBS.  Resp. Ex. A at 6-8.[7]  Dr. Donofrio also opined that Mr. Bussa's presentation on October 30, 2013 was more likely explained by a transient ischemic attack or other manifestation of his preexisting medical conditions.  *Id.* at 8-9.  Afterwards, petitioner's expert Dr. Souayah filed a supplemental report.  He contended that the Brighton criteria are used for research, not clinical diagnosis and treatment.  Pet. Ex. 45 at 3.  Dr. Souayah addressed many other points raised by Dr. Donofrio.  Significantly, Dr. Souayah allowed that multiple processes, including a possible transient ischemic attack, were probably occurring concurrently when Mr. Bussa presented at the end of October 30, 2013.  *Id.* at 1.[8]

The second challenge was whether this claim was eligible for compensation under the Vaccine Act, which requires evidence of injury (1) with sequelae lasting for at least six months; (2) resulting in hospitalization *and* surgical intervention; or (3) resulting in death.  § 11(c)(1)(D)(i).  Relevant to subsection (2), Mr. Bussa was hospitalized but did not undergo surgery relating to the vaccine injury alleged.  Under subsection (3), while Mr. Bussa

---

[4] *See also* Mount Sinai, *Profile – David M. Simpson, M.D.*, available at https://www.mountsinai.org/profiles/david-m-simpson (last accessed May 1, 2019).

[5] Certain other medical records mention a diagnosis of GBS.  *See, e.g.*, Pet. Ex. 18 at 3-5 (primary care physician's record on December 9, 2013).  These are less probative for the reason that the diagnosis of GBS was self-reported by Mr. Bussa and not based on independent evaluation by the medical providers creating those records.

[6] Citing Asbury A.K. & Cornblath D.R., *Assessment of Current Diagnostic Criteria for Guillain-Barré syndrome*, 27 Suppl. S21-4 (1990) [Pet. Ex. 35].

[7] Citing Sejvar J.J. et al., *Guillain-Barré syndrome and Fisher syndrome: Case Definitions and Guidelines for Collection, Analysis, and Presentation of Immunization Safety Data*, 29 Vaccine 599 (2001) [Resp. Ex. E].

[8] While not discussed by Dr. Souayah, earlier in the case, petitioner's counsel suggested that a transient ischemic attack would be associated with weakness on only side of the body, not the bilateral weakness that Mr. Bussa experienced.  *See* Order issued November 24, 2015 (ECF No. 31).

subsequently passed away, neither petitioner nor petitioner's expert alleges that Mr. Bussa's death was a result of that alleged vaccine injury. Amended Petition; Pet. Exs. 33, 43, 45. Thus, the claim would only be eligible for compensation if petitioner established that Mr. Bussa had residual injuries of his alleged vaccine injury lasting for more than six months. From the beginning of the case, the presiding special master and respondent raised this issue. *See, e.g.*, Order filed August 26, 2015 (ECF No. 22); Resp. Rep't. filed January 19, 2016 (ECF No. 34).

Mr. Bussa averred that after the vaccine and acute episode in late October 2013, he experienced new fatigue, weakness in his lower extremities, decreased mobility, and weight loss persisting for more than six months. As a result, he delayed an annual winter trip from New York to Florida. While he was in Florida, he was unable to keep up with his regular schedule working as a barber. Pet. Ex. 20 at ¶¶ 5-8. After Mr. Bussa returned from Florida, on May 23, 2014, his neurologist Dr. Stevens recored his complaints of not feeling the same since the flu vaccine. Dr. Stevens recorded persistent weakness and specific neurologic symptoms including decreased pin prick and vibration in the bilateral lower extremities, and persistent diminished reflexes. Pet. Ex. 15 at 15-16. Petitioner's expert Dr. Souayah opined that these constituted long-term residual effects of Mr. Bussa's suspected GBS. He also provided literature for the proposition that chronic fatigue is a long-term consequence of GBS. Pet. Ex. 33 at 21 and Pet. Ex. 43 at 1-2 (internal citations omitted).

However, Dr. Souayah's initial report does not cite to any medical records dated prior to the vaccination. Pet. Ex. 33 at 4. In his second report, Dr. Souayah opined that Mr. Bussa's "fatigue is most likely related to Guillain-Barré syndrome **as the patient did not report that before vaccination**." Pet. Ex. 43 at 1 (emphasis added). Dr. Souayah also opined: **"[P]rior to vaccination,** although the patient was admitted for complications relating to his heart condition, **there is no consistent documentation that the patient was complaining of fatigue.**" *Id.* at 1-2 (emphasis added). This is not accurate. In fact, there are numerous pre-vaccination medical records of fatigue, weakness, and similar symptoms. *See, e.g.,* Pet. Ex. 9 at 42-47 (urologist's notation of fatigue, weakness, dyspnea on exertion, and joint stiffness on August 23, 2012); Pet. Ex. 9 at 36-42 (urologist's notation of muscle cramps, fatigue, weakness, dyspnea and extertion, joint stiffness and muscle cramps on October 25, 2012); Pet. Ex. 13 at 1922 (complaint of weakness and shaking of his arms and legs during hospitalization for renal failure in June 2013); Pet. Ex. 14 at 5, 42 (August 11, 2013 hospitalization for chest pain and shortness of breath); Pet. Ex. 9 at 24-29 (hematologist's notation of weakness, fatigue and malaise on August 27, 2013); Pet. Ex. 4 at 18 (urologist's notation of dizziness and weakness on August 30, 2013); Pet. Ex. 14 at 181-82 (September 19, 2013 hospitalization for general weakness, fatigue, lightheadedness associated with low blood pressure; nausea and vomiting); Pet. Ex. 14 at 269 (October 4, 2013 emergent care for shortness of breath); Pet. Ex. 9 at 18-20 (hematologist's notation of weakness, fatigue, dyspnea on exertion, and joint pain stiffness in legs on October 8, 2013).

It is possible that the treating neurologist Dr. Stevens did not see these records created by different providers and that he was not told about prior fatigue by Mr. Bussa, whom he saw for the first time following Mr. Bussa's hospital admission on October 30, 2013. However, the presiding special master, respondent, and respondent's expert Dr. Donofrio all raised that petitioner complained of fatigue prior to the vaccination. It was incumbent on petitioner, petitioner's counsel, and petitioner's expert Dr. Souayah to address them. However, they did

not.  Neither did Dr. Souayah ever address the natural course of his preexisting conditions, including congestive heart failure and kidney disease, which were listed as the causes of Mr. Bussa's death on February 1, 2016.  Pet. Ex. 35.  It is concerning that petitioner's counsel and Dr. Souayah, who both have significant experience in the Program and have performed adequately in other cases, did not squarely acknowledge the preexisting conditions and their significance compared to the alleged vaccine injury.

However, the totality of the circumstances includes receipt of a vaccine associated with GBS, at least a possible diagnosis of GBS, and possible residual injuries lasting for over six months according to at least one treating physician.  Additionally, an expert with relevant clinical experience and understanding of the Vaccine Program offered several reports and supporting medical literature expanding on these issues.  Pet. Exs. 33, 43, 45.  After the presiding special master reiterated her concerns, *see* Order issued April 13, 2017 (ECF No. 59), the case was set for an entitlement hearing, *see* Order issued June 2, 2017 (ECF No. 60).  Afterwards, petitioner's counsel did not incur significant additional fees and costs.  They only made billing entries for communicating with the petitioner (at that point, Mr. Bussa's wife) about how to proceed and then preparing for the hearing.  *See* Pet. App. at 31-32.  The case was then transferred to me.  Notice of Reassignment issued January 16, 2018 (ECF No. 62).  I was not bound by the past special master's opinions or conclusions.  However, I also felt that it would be difficult for petitioner to establish that Mr. Bussa developed GBS and experienced and residual injuries lasting for more than six months.  Upon review, petitioner particularly failed to address whether Mr. Bussa's preexisting medical conditions were not the sole or substantial cause of his development of chronic fatigue and possible mild neurologic symptoms lasting longer than six months after the flu vaccine.  Those preexisting conditions indeed were listed as the causes of his natural death less than 2.5 years later.  Neither the treating neurologist Dr. Robinson nor petitioner's expert Dr. Souayah addressed this possibility at any length.  After I communicated my concerns about the case, petitioner's counsel confirmed that they would not proceed to the entitlement hearing set for June 2018 and they requested an opportunity to allow petitioner to seek alternate counsel.  Order filed February 22, 2018 (ECF No. 63); Pet. Motion filed April 5, 2018 (ECF No. 65).  I then had a status conference with the petitioner (Mr. Bussa's wife, accompanied by her adult daughter), petitioner's counsel, and respondent's counsel.  Order filed May 17, 2018 (ECF No. 67).  I recommended dismissing the case based on the low likelihood of success and petitioner's counsel's wish to withdraw.  *Id.*  Afterwards, petitioner and her counsel of record requested dismissal of the case.  Pet. Mot. filed June 6, 2018 (ECF No. 68).  I appreciate their attention to my comments and recognition of the issues.

While the alleged vaccine injury was likely not supported by a preponderance of the evidence, it was supported by a lower degree of evidence supporting a finding of reasonable basis to file the claim and pursue up until it was voluntarily dismissed.  Thus, petitioner should receive reasonable attorneys' fees and costs.  (However, I find it within my discretion and appropriate to reduce the attorneys' fees and the expert's costs for not addressing these issues more promptly and thoroughly, which is addressed below.)

### III.   Reasonable Attorneys' Fees and Costs

The applicable legal standard for what attorneys' fees and costs are deemed "reasonable" is generally known and is provided in many past decisions. *See, e.g., Agarwal v. Sec'y of Health & Human Servs.*, No. 16-191V, 2019 WL 2281744 (Fed. Cl. Spec. Mstr. Apr. 23, 2019); *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). Special masters have "wide discretion in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991). They may look to their experience and judgment to reduce the number of hours billed to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993). A line-by-line evaluation of the billing records is not required. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (1991), *aff'd in relevant part*, 988 F.2d 131 (Fed. Cir. 1993 (per curiam).

The petitioner "bea[rs] the burden of establishing the hours expended, the rates charged, and the expenses incurred" are reasonable. *Wasson*, 24 Cl. Ct. at 484. Adequate proof of the claimed fees and costs should be presented when the motion is filed. *Id.* at 484, n. 1. Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

#### A.   Hourly Rates

The interim fee decision in *McCulloch* provides a framework for consideration of appropriate ranges for attorneys' fees based upon an individual's experience. *McCulloch*, 2015 WL 5634323. The Court has since updated the *McCulloch* rates. The Attorneys Forum Hourly Rate Fee Schedules for 2015-2016, 2017, 2018, and 2019 can be accessed online.[9]

In this case, petitioner provides the hourly rates for several attorneys and paralegals at the firm Conway, Homer P.C., who worked on this case. The rates for these individuals have previously been found to be reasonable and have thus, been awarded. *Agarwal v. Sec'y of Health & Human Servs.*, 2019 WL 2281744; *Berrett v. Sec'y of Health & Human Servs.*, No. 16-011V (Fed. Cl. Spec. Mstr. March 1, 2019); *Babb v. Sec'y of Health & Human Servs.*, No. 15-195V (Fed. Cl. Spec. Mstr. Feb. 28, 2019); *Garvin v. Sec'y of Health & Human Servs.*, No. 17-101V (Fed. Cl. Spec. Mstr. Jan. 23, 2019). They will also be awarded in the present case.

#### B.   Hours Expended

As previously noted, a line-by-line evaluation of the fee application is not required and will not be performed. *Wasson*, 24 Cl. Ct. at 484. Rather, I may rely on my experience to evaluate the reasonableness of hours expended. *Id.* Just as "[t]rial courts routinely use their prior experience to reduce hourly rates and the number of hours claimed in attorney fee requests …. [v]accine program special masters are also entitled to use their prior experience in reviewing

---

[9] United States Court of Federal Claims – OSM Attorneys' Forum Hourly Rate Fee Schedules, available at http://www.cofc.uscourts.gov/node/2914.

fee applications." *Saxton*, 3 F.3d at 1521.

Petitioner requests $75,191.00 in attorneys' fees associated with the underlying claim and $12,162.20 in attorneys' fees associated with preparing a reply to respondent's challenge to reasonable basis. *See* Pet. Fee App.; Pet. Supp. Fee App.

The billing records are generally well-prepared. They contain sufficient detail about each task performed, the date, and the individuals involved. The hours expended are generally reasonable. I do not take issue with any particular billing practices shown in the records.

However, as discussed above in the reasonable basis section, I am concerned that Mr. Bussa's prior medical history and prior complaints of fatigue were not appropriately addressed by petitioner's counsel and petitioner's expert. Mr. Bussa's pre-vaccination medical conditions and complaints of fatigue are not addressed in the petition or in his accompanying affidavit. These issues were readily observed by Special Master Millman. Afterwards, neither Mr. Bussa nor his wife provided supplemental affidavits. Dr. Souayah submitted three reports which provide some support for the proposition that chronic fatigue is a long-term consequence of GBS, but largely do not engage with Mr. Bussa's preexisting medical history or the likely course of the same. Based on the record as it stands, my opinion is that Mr. Bussa's long-term symptoms were equally or more likely caused by his preexisting conditions which were listed as the causes of his death. Counsel's failure to address this issue contributed to additional time, effort, and expense before the case was eventually dismissed. In my discretion, I find it appropriate to reduce the requested attorneys' fees (including the costs associated with preparing the reply) by one-third, **resulting in a reduction of $29,117.73.**

### C.   Costs

Like attorneys' fees, costs incurred - by counsel or petitioners themselves - must be reasonable to be reimbursed by the Program. *Perreira*, 27 Fed. Cl. 29, 34. Here, petitioner's counsel requests a total of $29,396.70, including, *inter alia*, the costs associated with the filing fee, medical records, shipping and postage; and medical literature cited by the experts. These costs are generally reasonable and adequately documented.

The greatest single cost is a $22,500.00 invoice from petitioner's expert Dr. Souayah. In light of my reservations about establishing a diagnosis of GBS and more particularly, GBS sequelae for more than six months (which were not more likely caused by Mr. Bussa's preexisting conditions), I will also reduce Dr. Souayah's request by one-third, **resulting in a reduction of $7,500.00.**

Petitioner herself requests $111.00 for establishing herself as the executor of her husband's estate during the pendency of his claim. Respondent notes that petitioner does not allege that her husband's death was vaccine-related, nor was a settlement agreement entered into by the parties that stipulated petitioner would be appointed executor or the personal representative of Mr. Bussa's claim. Resp. Response at 1 n. 1. However, respondent acknowledges that earlier in the case, petitioner's counsel raised that establishing the wife's representative capacity over Mr. Bussa's estate "was only required for petitioner's continuance

of her husband's vaccine petition." *Id.* at 3 n. 2.  Without more specific objection from respondent, I find it reasonable to reimburse petitioner for this limited cost.

## IV.    Conclusion

In accordance with the foregoing, petitioner's application for attorneys' fees and costs is **GRANTED**.  I find that she is entitled to the following reasonable attorneys' fees and costs at this time:

| | |
|---|---:|
| Attorneys' Fees Requested: | $87,353.20 |
| *1/3 Reduction Overall:* | *- $29,117.73* |
| **Attorneys' Fees Awarded:** | **$58,235.47** |
| | |
| Attorneys' Costs Requested: | $29,396.70 |
| 1/3 Reduction to Dr. Souayah's Request: | -$7,500.00 |
| **Attorneys' Costs Awarded:** | **$21,896.70** |
| | |
| **Attorneys' Fees and Costs Awarded:** | **$80,132.17** |
| | |
| **Petitioner's Costs Awarded:** | **$111.00** |

Accordingly, I award the following:

1) **A lump sum in the amount of $80,132.17, representing reimbursement for attorneys' fees and costs, in the form of a check payable jointly to petitioner and her counsel, Ronald C. Homer of Conway Homer, P.C.**

2) **A lump sum in the amount of $111.00, representing reimbursement for petitioner's costs, in the form of a check payable solely to petitioner.[10]**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court is directed to enter judgment forthwith.[11]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[10] These amounts are intended to cover all legal expenses incurred in this matter.  This award encompasses all charges by the attorney against a client, "advanced costs," and fees for legal services rendered.  Furthermore, Section 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein.  *See generally Beck v. Sec'y of Health & Human Servs.*, 924 F.2d 1029 (Fed. Cir. 1991).

[11] Entry of judgment is expedited by each party's filing notice renouncing the right to seek review.  Vaccine Rule 11(a).